### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Case No. 25-31318 |
| Midwest Engineered Components, Inc., | Chapter 11 |
| Debtor. | |

## ORDER OVERRULING OBJECTIONS TO PLAN CONFIRMATION

This case came before the Court on confirmation of the Debtor's Fourth Modified Chapter 11 Small Business Subchapter V Plan. ECF No. 124. The US Trustee and Bonfiglioli USA, Inc. filed objections to confirmation. ECF Nos. 85, 86. The Debtor filed a response. ECF No. 87. The objections were originally filed with respect to the Debtor's First Modified Plan, and the objecting parties maintain their objections with respect to the Fourth Modified Plan.

The Court held an evidentiary hearing on January 26, 2026. Appearances were made by John Lamey for the Debtor; Matthew Burton for Bonfiglioli USA, Inc.; Colin Kreuziger for the US Trustee; and Steven Nosek as the Subchapter V Trustee. Patrick Frater testified for the Debtor. The Court received joint Exhibits 1–31 into evidence.

At the end of the evidentiary hearing, the Court set deadlines for post-hearing briefs. The US Trustee, Bonfiglioli, the Subchapter V Trustee, and the Debtor timely filed briefs. ECF Nos. 111, 112, 115, 117. The Court heard oral arguments from the parties on March 4, 2026, and the matter was taken under advisement. The Debtor filed the Fourth Modified Plan on March 28, 2026, and the parties filed an additional fact stipulation on April 9, 2026. ECF Nos. 124, 128. However, the objecting parties have not withdrawn their objections to confirmation.

Plan confirmation arises under 11 U.S.C. § 1191 and is a core proceeding under 28 U.S.C. § 157(b)(2). The Court has considered the exhibits and testimony from the January 26 evidentiary

1

hearing, as well as the fact stipulations at ECF Nos. 99 and 128. The Court also has considered the parties' briefs and arguments from the March 4 hearing. For the reasons the Court shall state, the Court overrules Bonfiglioli and the US Trustee's objections to plan confirmation.

## **FINDINGS OF FACT**

The following findings of fact are based upon all of the evidence, the credibility of witnesses, the record, and proceedings. To the extent factual findings are included in other parts of the Court's decision, the Court incorporates such findings herein.

1. The Debtor filed the petition commencing this Chapter 11 case on April 30, 2025 (the "Petition Date"). ECF No. 99 ¶ 6.

2. The Debtor's schedules show $279,897.47 in assets and $358,390.61 in liabilities. Ex. 1 at 8.

3. The largest scheduled asset is a $250,000.00 claim against Bonfiglioli. Ex 1 at 12.

4. The Debtor has not succeeded in recovering on that claim against Bonfiglioli. ECF No. 106 at 34:10–42.

5. The Debtor's other assets include office furniture, electronics, a 2020 Honda Ridgeline, and a checking account at Bremer Bank. Ex. 1 at 9–13.

6. The Debtor does not own any real property. Ex. 1 at 11.

7. The Debtor has no secured creditors. Ex. 1 at 14.

8. The Debtor's schedules list 9 unsecured creditors. Ex. 1 at 15–17.

9. Only three unsecured creditors filed a proof of claim: Bonfiglioli for $280,001.00; JPMorgan Chase Bank, N.A. for $2,935.47; and the IRS for $68.47. Exs. 9, 10, 11.

10. Bonfiglioli's claim is disputed. ECF No. 124 at 3.

11. Bonfiglioli's disputed claim is based on a $280,001.00 judgment obtained against the Debtor following a jury trial in Case No. 23-cv-14 in the United States District Court for the Eastern District of Kentucky. ECF No. 99 ¶¶ 2–3; Ex. 9 at 4.

12. The Debtor appealed that judgment in March 2025, and the appeal remains pending before the United States Court of Appeals for the Sixth Circuit. ECF No. 99 ¶ 4.

13. The Debtor operates a manufacturer representative company in Burnsville, Minnesota, in sales of engineered electrical and mechanical component products. ECF No. 99 ¶ 1.

14. The Debtor has three employees. Ex. 25 at 3; ECF No. 106 at 29:56–30:03.

15. The Debtor also partners with "subreps" that cover their own operational costs and are paid by commission on completed sales. ECF No. 106 at 09:04–40.

16. The Debtor lost its biggest customer in January 2025, and the resulting decrease in revenue was one reason for the Debtor's bankruptcy filing. ECF No. 106 at 29:15–55.

17. On July 29, 2025, the Debtor filed a Chapter 11 Small Business Subchapter V Plan, which was not confirmed. ECF No. 99 ¶ 8.

18. On November 14, 2025, the Debtor filed its First Modified Chapter 11 Small Business Subchapter V Plan. ECF No. 99 ¶ 9.

19. The First Modified Plan projected $290,000.00 in revenue for 2026, $360,000.00 in revenue for 2027, and $400,000.00 in revenue for 2028. Ex. 27 at Ex. B.

20. On March 28, 2026, the Debtor filed its Fourth Modified Chapter 11 Small Business Subchapter V Plan. ECF No. 124.

21.    The Fourth Modified Plan projects $258,000.00 in revenue for 2026, $283,000.00 in revenue for 2027, and $320,000.00 in revenue for 2028. ECF No. 124 at 9.

22.    Frater prepared the projections for each of the Debtor's plans. ECF No. 106 at 05:35–52.

23.    Frater testified that the projected revenue decreased because he could more accurately project future revenues due to having more information over time. ECF No. 106 at 06:38–07:45.

24.    Frater testified that the projected expenses also decreased due to internal cost-cutting measures and the shifting of certain expenses to subreps. ECF No. 106 at 07:45–09:04.

25.    In April 2025, the Debtor had a total income of $10,875.26 and a net income of negative $4,915.08. Ex. 5 at 5.

26.    In May 2025, the Debtor had a total income of $14,671.69 and a net income of negative $1,806.78. Ex. 5 at 6.

27.    Frater loaned the Debtor $7,000.00 on April 29, 2025 and $5,000.00 on May 29, 2025, resulting in positive net cash flows for the months of April and May 2025. Ex. 5 at 2, 5–6.

28.    In June 2025, the Debtor had a total income of $16,350.55 and a net income of $876.97. Ex. 7 at 6.

29.    In July 2025, the Debtor had a total income of $20,636.53 and a net income of $3,561.06. Ex. 8 at 5.

30.    In August 2025, the Debtor had a total income of $16,653.13 and a net income of $301.12. Ex. 21 at 11.

31.   In September 2025, the Debtor had a total income of $17,141.24 and a net income of $2,023.40. Ex. 22 at 10.

32.   In October 2025, the Debtor had a total income of $19,981.46 and a net income of $815.89. Ex. 23 at 11.

33.   In November 2025, the Debtor had a total income of $16,787.32 and a net income of $260.43. Ex. 24 at 10.

34.   In December 2025, the Debtor had a total income of $16,452.26 and a net income of $1,363.47. Ex. 25 at 10.

35.   Frater testified that the Debtor is current on all its vendor payments, expenses, and taxes. ECF No. 106 at 21:55–22:20.

36.   On December 1, 2025, Regal Beloit America, Inc. ("Regal") entered into a representative agreement with Technical Partners Group Inc. ("TPG"). ECF No. 106 at 09:40–10:14; Ex. 31 at 1.

37.   Under the agreement, TPG will be promoting and selling certain Regal products. Ex. 31 at 1–4, 18.

38.   Frater testified that he helped arrange the agreement between Regal and TPG due to his longstanding relationship with Regal. ECF No. 106 at 10:14–53.

39.   The Debtor is handling technical support and customer service between TPG and Regal so that TPG can focus on sales. ECF No. 106 at 10:53–11:54.

40.   TPG and the Debtor signed a contract covering that arrangement. See Ex. 28.

41.   TPG is paying the Debtor $5,000.00 per month in exchange for that technical support and customer service work. ECF No. 106 at 11:54–12:33; Ex. 28 at 2.

42. In January 2026, the Debtor received the first monthly payment of $5,000.00 from TPG. ECF No. 106 at 12:34–59.

43. Frater testified that the Debtor's agreement with TPG will increase revenue without increasing expenses and thus will go directly to the Debtor's bottom line. ECF No. 106 at 13:27–14:04.

44. The Fourth Modified Plan proposes to pay unsecured creditors $180,000.00 over 36 months, which is $5,000.00 per month. ECF No. 124 at 1.

45. The Debtor estimates that general unsecured creditors would receive a total of $16,235.63 in a Chapter 7 liquidation. ECF No. 124 at 8.

46. Frater testified that the Debtor's agreement with TPG will increase the Debtor's net income and that the Debtor will be able to make the $5,000.00 monthly plan payments. ECF No. 106 at 15:28–54.

47. As of December 31, 2025, Frater had a non-retirement brokerage account with a balance of $518,653.62. ECF No. 106 at 17:30–18:22; Ex. 30 at 2.

48. Frater testified that he owns a house in Wisconsin that is worth approximately $500,000.00 and is encumbered by a mortgage with a balance of approximately $200,000.00. ECF 107 at 02:52–03:36.

49. The Fourth Modified Plan makes Frater personally liable for plan payments if the Debtor fails to make such payments. ECF No. 106 at 18:30–19:58, 21:30–40; ECF No. 124 at 5.

50. Frater believes he probably will not have to make any such payments and that any shortfalls would be small. ECF No. 106 at 21:41–54.

51. Frater received gross income from the Debtor totaling $79,999.92 in 2022, $79,999.92 in 2023, $26,999.99 in 2024, and $9,999.99 in 2025. ECF No. 128 ¶ 4.

52. Frater has not received any income from the Debtor during this Chapter 11 case. ECF No. 128 ¶ 5.

53. The Fourth Modified Plan's projections do not include any compensation for Frater. ECF No. 128 ¶ 3.

54. The Fourth Modified Plan commits the Debtor or its principal to escrow $5,000.00 each month for 36 months into the Debtor's attorney's trust account. ECF No. 124 at 3.

55. To the extent, if any, the Debtor's net cash flow exceeds the projected $5,000.00 per month, the Fourth Modified Plan allows Frater to be paid up to $3,000.00 per month. ECF No. 124 at 4.

56. Every six months after the plan's effective date, each holder of an undisputed general unsecured claim will receive its pro-rata share of the escrowed funds. ECF No. 124 at 3.

57. A holder of a disputed general unsecured claim will not receive any distribution until its claim has been allowed by a final, non-appealable order. ECF No. 124 at 3–4.

58. Bonfiglioli's claim is the only disputed claim. ECF No. 106 at 59:37–43.

59. Frater testified that, to the best of his knowledge, the Second Modified Plan complies with the applicable provisions of the Bankruptcy Code. ECF No. 106 at 22:24–47.

60.    Frater testified that, to the best of his knowledge, the Debtor has complied with all applicable provisions of the Bankruptcy Code. ECF No. 106 at 22:47–55.

61.    Frater testified that the plan was proposed in good faith, based on realistic projections, and not by any means forbidden by law. ECF No. 106 at 22:55–23:25.

62.    Frater testified that the Debtor would obtain the Court's approval before paying any professional fees. ECF No. 106 at 23:27–37.

63.    Frater testified that he would serve as CEO and continue to operate the Debtor after plan confirmation. ECF No. 106 at 23:37–52.

64.    Frater testified that no governmental regulatory commission would have postconfirmation jurisdiction over the rates charged by the Debtor. ECF No. 106 at 23:52–24:10.

65.    Frater testified that creditors would receive more under the terms of the plan than they would in a liquidation. ECF No. 106 at 24:11–31.

66.    Frater testified that Bonfiglioli has objected to plan confirmation. ECF No. 106 at 24:31–47.

67.    Frater testified that the Debtor would pay the IRS's priority tax claim on the plan's effective date. ECF No. 106 at 24:47–25:09.

68.    Frater testified that the Debtor has a cash cushion of approximately $10,000.00 and that the Debtor does not anticipate any significant expenses that would deplete that cushion. ECF No. 106 at 25:09–36; Ex. 25 at 7.

69.    Frater testified that plan confirmation would not be followed by the need for further reorganization. ECF No. 106 at 25:47–26:05.

70.     Frater testified that, to the best of his knowledge, all fees required to be paid under the plan have been paid. ECF No. 106 at 26:05–13.

71.     Frater testified that the Debtor is current on its obligations related to employee IRAs, which is the only retiree benefit that the Debtor provides. ECF No. 106 at 26:14–37.

72.     Frater testified that any transfers of property under the plan will be made in accordance with nonbankruptcy law. ECF No. 106 at 26:37–48.

73.     Frater testified that he believes the plan is fair and equitable with respect to creditors and commits all the Debtor's disposable income to plan payments for the plan's term. ECF No. 106 at 26:52–27:38.

## DISCUSSION

Bonfiglioli and the US Trustee object to the Debtor's Fourth Modified Plan on three grounds. First, Bonfiglioli argues the plan is proposed in bad faith. Second, Bonfiglioli and the US Trustee argue the plan is not feasible. Third, Bonfiglioli and the US Trustee argue the plan is not fair and equitable. All these objections are overruled.

**A. The Fourth Modified Plan Has Been Proposed In Good Faith.**

Courts cannot confirm a Chapter 11 plan unless the plan has been proposed in good faith. 11 U.S.C. § 1129(a)(3). "A plan is considered proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." In re Peabody Energy Corp., 933 F.3d 918, 927 (8th Cir. 2019) (citation omitted). "To determine whether a plan has been proposed in good faith, the totality of the circumstances surrounding the creation of the plan must be considered." Id. (citation omitted).

9

Bonfiglioli argues that the Debtor proposed the Fourth Modified Plan in bad faith. ECF No. 112 at 4. Bonfiglioli states this is a two-party dispute where the Debtor is weaponizing Chapter 11 to obtain a supersedeas bond. Id. In other words, Bonfiglioli believes the plan will not "achieve a result consistent with the standards prescribed under the Code." Peabody, 933 F.3d at 927.

The Debtor and the Subchapter V Trustee argue that plan confirmation will preserve estate value and that liquidation would not benefit anyone—including Bonfiglioli. ECF No. 117 at 2; ECF No. 115 at 3. Both the Debtor and the Subchapter V Trustee also emphasize that the Debtor has employees and subreps to whom the business is crucial. ECF Nos. 117 at 5–6; ECF No. 115 at 3. The Subchapter V Trustee also notes that there are other creditors in the case. ECF No. 115 at 3.

The Court agrees with the Debtor and the Subchapter V Trustee that the Fourth Modified Plan has been proposed in good faith. The issues in this case strikingly resemble In re Edgewood Food Mart, Inc., 666 B.R. 418 (Bankr. N.D. Ga. 2024). In Edgewood, a Chapter 11 Subchapter V debtor operated a convenience store. 666 B.R. at 424–25. The debtor had a sole shareholder who also acted as the CEO. Id. at 425. In 2021, a shooting occurred at the store, and the shooting victim ultimately obtained a $2,375,000.00 judgment against the debtor. Id. The debtor experienced no financial issues prior to the judgment but became insolvent after the judgment creditor began garnishing the debtor's accounts. Id. The debtor then filed for Chapter 11 protection. Id. at 423. The judgment creditor filed a motion to dismiss or convert the case as filed in bad faith (which was denied) and later objected to plan confirmation. Id. at 422–23. The judgment creditor's objection to confirmation argued that the debtor's plan was not proposed in good faith, was not feasible, was not fair and equitable, and failed the liquidation test. Id. at 422. Regarding lack of good faith, the judgment creditor argued that the debtor was simply keeping its business operating

10

for the "minimum amount of time required under Chapter 11 so that Mr. Lester's judgment will be discharged." Id. at 430.

The court determined the plan was filed in good faith and noted that:

Debtor, when faced with Mr. Lester's large judgment against it, could have closed its doors, leaving all its creditors without recourse. But it did not. Debtor could have filed Chapter 7, liquidated its minimal assets and given creditors a lower payoff. But it did not. Instead, Debtor filed Chapter 11. Debtor set out to reorganize its debts, allowing creditors to get more than if Debtor had filed Chapter 7 or simply closed the business and dissolved under state law.

Edgewood, 666 B.R. at 430. The debtor also had obtained concessions from its principal, including the payment of certain expenses, a reduced salary during the plan term, and a personal guaranty via the escrowing of funds for plan payments in case the debtor's income decreased. Id. at 430, 436–37. The court concluded that such behavior did not indicate a lack of good faith.

Here, the Court reaches the same conclusion for many of the same reasons. The question is whether the totality of the circumstances show "a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." Peabody, 933 F.3d at 927. Plan confirmation will preserve estate value and provide Bonfiglioli with a much greater recovery than it would receive in a liquidation. Plan confirmation will preserve jobs. These outcomes are consistent with the Bankruptcy Code.

It is true that Bonfiglioli is the main creditor in this case and will receive less than the full judgment amount. However, denying confirmation would only further diminish Bonfiglioli's recovery. Like the debtor in Edgewood, "[the] Debtor could have filed Chapter 7, liquidated its minimal assets and given creditors a lower payoff. But it did not." Edgewood, 666 B.R. at 430. Instead, the Debtor has cut expenses, worked to increase its revenue, and obtained a personal guaranty of the plan payments by Frater.

11

Moreover, Frater's personal guaranty is highly unusual. In bankruptcy, litigation typically arises from individuals attempting to avoid personal liability. See, e.g., Harrington v. Purdue Pharma L. P., 603 U.S. 204 (2024). Here, Frater has agreed to personal liability for plan payments in the event the Debtor fails to make those payments. The Bankruptcy Code contains no requirement that a corporate debtor's principal must agree to such liability, yet the Debtor has obtained it here. The Court cannot agree with Bonfiglioli that going above and beyond what the Bankruptcy Code requires constitutes bad faith.

The cases cited by Bonfiglioli are distinguishable. In Stage I Land Co. v. U.S. Housing and Urban Development Dept., 71 B.R. 225 (D. Minn. 1986), the owners of several apartment buildings filed Chapter 11 petitions two hours before a scheduled foreclosure sale. 71 B.R. at 230. The debtors filed the petitions only after their attempts to obtain a stay pending appeal of the foreclosure order had failed. Id. The debtors' schedules valued the buildings at $12,000,000.00 total, but the buildings were subject to a $40,000,000.00 claim by HUD and another $150,000.00 in mechanics' liens. Id. The bankruptcy court dismissed the cases, and the district court affirmed, concluding that these circumstances constituted bad faith rather than attempted reorganization. Id. at 231. Specifically, the Court emphasized the improbability of a successful reorganization, the lack of equity in the property, the last-minute filing of the petitions, and the two-party nature of the dispute (which had already been resolved outside of bankruptcy). Id. at 229–30.

The Court has already addressed many of these issues in its decision denying Bonfiglioli's motion to dismiss. See Oral Rendering at ECF No. 65. Here, as the Court will explain, the Debtor has a reasonable likelihood of successful reorganization. The Debtor's appeal of Bonfiglioli's judgment continues, but it is not like the last-minute foreclosure situation in Stage I. The Debtor

has a profitable business and is working in good faith to reorganize. Therefore, Stage I is distinguishable.

Bonfiglioli also cites In re Hall, 4 B.R. 341 (Bankr. E.D. Va. 1980), where the court determined that a Chapter 13 plan proposing to pay only 6% of allowed unsecured claims was not filed in good faith. 4 B.R. at 342–43. The court concluded that "for a plan to be proposed in good faith it must provide for substantial and meaningful payments to the unsecured creditors." Id. at 342. The court found that paying 6% of unsecured claims was not meaningful or substantial. Id. at 342–43.

Here, the Debtor proposes to pay over 60% of unsecured claims. If the Bonfiglioli judgment is reversed on appeal or damages are reduced, the Debtor could pay 100% of unsecured claims. Therefore, the court's reasoning in Hall does not apply here.

Bonfiglioli also cites In re Purpura, 170 B.R. 202 (Bankr. E.D.N.Y. 1994), an individual Chapter 11 case that was filed by a man who was not in genuine financial distress for the purpose of delaying property distributions under a divorce decree. 170 B.R. at 206–07. The court explained that "bankruptcy rehabilitation provisions are intended to benefit only those in genuine financial distress and are not to be used strategically as an avoidance mechanism to get out of particular obligations viewed by a debtor as having undesirable consequences." Id. at 207. Therefore, the court dismissed the case for cause under 11 U.S.C. § 1112(b). Id. at 211.

Here, the Debtor is in genuine financial distress and proposes to pay the majority of its debts. The Debtor also has employees and independent contractors with whom it wishes to continue working. Yet, without bankruptcy protection, the Debtor would have gone out of business. The Debtor is unlike the debtor in Purpura.

13

Finally, Bonfiglioli cites In re Mattson, 241 B.R. 629 (Bankr. D. Minn. 1999), where the court found both the Chapter 13 case and the Chapter 13 plan were filed in bad faith. 241 B.R. at 639. The court found that the case was filed in bad faith because the debtors engaged in prepetition racial discrimination, "transferred a substantial portion of their assets to a newly formed corporation for little or no consideration and quit claimed property to a relative," and took various steps to avoid paying the discrimination judgment against them. Id. at 637–38. The court also found the debtors' Chapter 13 plan was not proposed in good faith because it was funded through the sale of the debtors' properties over a period of five years. 241 B.R. at 638. The court concluded the debtors' intent was to delay paying creditors while forcing creditors to bear the risk that the properties might decline in value. Id. at 638–39.

Here, the Debtor has not attempted to remove assets from the reach of creditors. The Debtor has few assets but has put its future revenues, as well as substantial assets owned by Frater, on the line to pay the majority of its debts. Although Bonfiglioli's judgment involves allegations of wrongful conduct, that conduct occurred under previous management. The Debtor simply has not acted like the debtor in Mattson.

In short, the totality of the circumstances establishes that the Fourth Modified Plan has been proposed in good faith. The next objection to confirmation is a lack of feasibility.

## B. The Fourth Modified Plan Is Feasible.

11 U.S.C. § 1129 requires that a bankruptcy court confirming a plan of reorganization must find that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).

14

"This statutory provision establishes what is commonly known as the 'feasibility' requirement, and as a practical matter it requires the court to find that the plan is 'workable' before it may be confirmed." In re Danny Thomas Props. II Ltd. P'ship, 241 F.3d 959, 962 (8th Cir. 2001). "While a reorganization plan's success need not be guaranteed, the bankruptcy court cannot approve a plan unless it has at least a reasonable prospect for success." Id. at 963. "Feasibility determinations must be 'firmly rooted in predictions based on objective fact.'" Id. at 964 (quoting In re Clarkson, 767 F.2d 417, 420 (8th Cir. 1985)). "The debtors bear the burden of establishing the feasibility of their plans by a preponderance of the evidence." Id. at 963.

Bonfiglioli and the US Trustee argue the Fourth Modified Plan is not feasible for three reasons. First, they argue the Debtor's projections are unreliable because the projections have changed multiple times, may or may not include Frater's salary, and somehow always result in $60,000.00 of annual profits. ECF No. 111 at 4–5; ECF No. 112 at 3. Second, they argue that the TPG contract can be cancelled and that Frater's testimony alone does not show the contract will succeed. ECF No. 111 at 6; ECF No. 112 at 2–3. Third, they argue Frater's personal guaranty is illusory because his assets have not been pledged and creditors have no way of knowing that the funds will be available if a default occurs. ECF No. 111 at 6; ECF No. 112 at 3–4.

The Debtor argues the projections have changed because more performance data allows the Debtor to make more accurate projections over time. ECF No. 117 at 3–4. The Debtor believes Frater's relationship with Regal and TPG suggests the TPG contract will last throughout and after the plan term. ECF No. 117 at 4. The Debtor also argues that Bonfiglioli has tools such as fraudulent transfer statutes at its disposal if Frater tries to dissipate assets to avoid the guaranty. ECF No. 117 at 4–5. The Debtor points out that those tools might allow Bonfiglioli to go after Frater's homestead—an outcome Frater assumedly would prefer to avoid. ECF No. 117 at 4–5.

15

### 1.  The Fourth Modified Plan's Projections Are Reasonable.

Bonfiglioli and the US Trustee correctly note that the Debtor's projections under the Fourth Modified Plan differ from the Debtor's previous projections. Both projected revenue and projected expenses have decreased. Compare Ex. 27 at Ex. B, with Ex. 29 at Ex. B. Bonfiglioli and the US Trustee argue this makes the Debtor's projections unreliable because the reductions have been significant, yet the Debtor still projects the same $60,000.00 of annual profits.

The Court finds the Fourth Modified Plan's projections to be reasonable. The plan requires $5,000.00 monthly payments. The Debtor's monthly operating reports show modest, positive net cash flows each month from June 2025 to December 2025. Now, the Debtor has secured a new contract (which is in the record) that the Debtor expects will increase monthly revenue by $5,000.00. Frater testified under oath that the Debtor received the first payment under the TPG contract in January 2026. The Fourth Modified Plan's projections make reasonable predictions based on this evidence.

The US Trustee's initial uncertainty as to whether the projections include a salary for Frater is moot—the parties have stipulated that the projections do not include Frater's salary. See ECF No. 111 at 5; ECF No. 128 ¶ 3. The plan allows Frater a salary up to $3,000.00 per month to the extent that the Debtor's net cash flow exceeds the $5,000.00 monthly plan payments. ECF No. 124 at 3. Therefore, this issue does not undermine feasibility because Frater only receives a salary when the Debtor makes more than the amount required for plan payments.

Similarly, Bonfiglioli's observation that the Fourth Modified Plan predicts the same $60,000.00 in annual profits as do previous plans does not undermine feasibility. See ECF No. 112 at 3. Of course, previous projections of $60,000.00 in annual profits may have been speculative—the Court specifically decided as much when denying confirmation of the Debtor's

16

first plan. However, the issue here is whether the Fourth Modified Plan makes reasonable predictions based on the evidentiary record. As stated above, the Fourth Modified Plan makes reasonable predictions based on Debtor's monthly operating statements, the new contract (which began performing in January), and Frater's testimony.

The US Trustee argues this case is like In re Diwan, L.L.C., 848 F.3d 1147 (8th Cir. 2017). In Diwan, the debtor had only $457.00 per month to make plan payments. 848 F.3d at 1150. However, the debtor's plan called for eventual monthly payments of $2,100.00. Id. The debtor's expenses also had fluctuated as much as $5,000.00 higher than the figure used in its projected cash-flow statement. Id. Therefore, the court agreed with the bankruptcy court's feasibility concerns. Id.

The Fourth Modified Plan does not present the same feasibility concerns. As already explained, the Fourth Modified Plan makes reasonable projections based on the evidence in the record, including the TPG contract and Frater's personal guaranty.

**2.   The Debtor Provided Sufficient Evidence That The TPG Contract Will Succeed.**

Bonfiglioli emphasizes the lack of evidence—other than Frater's testimony—that the Debtor has received any payments under the TPG contract. ECF No. 112 at 2–3. The US Trustee argues the contract is unreliable because it can be terminated upon 90 days' notice. ECF No. 111 at 6. The Debtor believes and testified the contract will last long beyond the plan's term due to Frater's long relationship with Regal and familiarity with the relevant products. ECF No. 117 at 4.

However, Bonfiglioli does not explain why Frater would personally guaranty plan payments and then lie under oath about the TPG payments that will help the Debtor to avoid relying on Frater's guaranty. Frater testified that the Debtor received the first TPG payment in

17

January 2026, and the contract itself was admitted into the record. The Court found Frater's testimony credible. Bonfiglioli's argument on this point does not undermine feasibility.

Similarly, the US Trustee's observation that the contract can be canceled does not preclude a finding of feasibility. The Court received no evidence that the contract will be cancelled. However, even if the contract is terminated before the Debtor finishes making all plan payments, Frater has personally guaranteed the plan payments. As already mentioned, this is highly unusual; individuals typically use bankruptcy to avoid personal liability. E.g., Harrington v. Purdue Pharma L. P., 603 U.S. 204 (2024). Frater's guaranty of the plan payments despite the contract's possible termination is proof of the probable viability of the contract. Frater's willingness suggests confidence in the contract. Therefore, the termination provision does not preclude feasibility.

### 3. Frater's Personal Guaranty Is Not Illusory.

The US Trustee emphasizes that Frater has not pledged his assets as part of his personal guaranty of plan payments. ECF No. 111 at 6. Bonfiglioli argues the guaranty funds should be escrowed in full because, otherwise, Frater can dissipate his assets to avoid fulfilling the guaranty. ECF No. 112 at 3–4. The Debtor responds that creditors have remedies, such as garnishment and fraudulent transfer statutes, if Frater tries to evade his personal guaranty of the plan payments. ECF No. 117 at 4–5.

However, the plan provides for a monthly escrowing of the guaranty funds to the extent the Debtor cannot make a given plan payment. The plan states: "The Debtor or its principal shall escrow $5,000 per month . . . for thirty-six (36) months." ECF No. 124 at 3 (emphasis added). "Any general unsecured creditor or party in interest may request proof of the escrowed funds from [Debtor's counsel] at any time." Id. This differs from an upfront escrowing of the entire

$180,000.00 in proposed payments, but creditors are nonetheless able to verify the monthly escrow payments and take appropriate actions if there is a default. See ECF No. 124 at 5. In fact, if a default occurs, the plan expressly empowers creditors to secure a personal judgment against Frater. Id.

Frater's brokerage account is worth almost three times the total payments under the plan. Ex. 30 at 2. Frater also testified there would be nonexempt equity in his Wisconsin homestead. ECF No. 107 at 02:52–03:36; ECF No. 117 at 5. The Court found Frater's testimony credible and has no reason to doubt his intentions. The Bonfiglioli lawsuit concerns events that preceded Frater's involvement with the Debtor; Frater has reduced expenses, secured a new contract, and put his own money on the line. The fact that Frater has not escrowed the full $180,000.00 upfront does not make the guaranty illusory.

It is highly unusual for a debtor's principal to agree to personal liability for plan payments. (Although not evidence, neither the Debtor's experienced counsel nor Bonfiglioli's experienced counsel are aware of such a guaranty being a part of any case in which either attorney has been involved. ECF No. 119 at 12:25–13:15; 27:45–28:03.) This is a strong guaranty backed by significant assets that, coupled with the judgment mechanism in the plan, provides much more than the "reasonable prospect for success" that the Bankruptcy Code requires. In re Danny Thomas Props. II Ltd. P'ship, 241 F.3d 959, 963 (8th Cir. 2001).

The Debtor has far surpassed what is required for feasibility, but Bonfiglioli and the US Trustee demand even more. Even though "a reorganization plan's success need not be guaranteed," id., Bonfiglioli and the US Trustee want the full amount pledged or escrowed. Of course, a debtor could seek such a concession from its principal—the debtor in Edgewood did. Edgewood, 666 B.R. at 437. However, Bonfiglioli and the US Trustee ask the Court to require that virtual guaranty

19

of payment before a plan can be confirmed. The Court will not impose such a heightened bar above and beyond the plan feasibility required by the Bankruptcy Code. Indeed, imposing such a requirement would make most—and perhaps nearly all—plans unconfirmable.

### C. The Fourth Modified Plan Is Fair And Equitable.

Courts shall confirm Subchapter V plans that satisfy all requirements of 11 U.S.C. § 1129(a) other than § 1129(a)(8), (10), and (15) "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1191(b). However, the fair and equitable requirement differs from non-Subchapter V cases. Compare § 1129(b), with § 1191(b). The fair and equitable requirement in Subchapter V cases has three components.

First, secured creditors must either retain liens or receive deferred cash payments equal to the amount of their secured claim. § 1191(c)(1). Second, the debtor must apply toward plan payments all the debtor's projected disposable income for the plan period. § 1191(c)(2)(A). Alternatively, the debtor can distribute property whose value is not less than such projected disposable income. § 1191(c)(2)(B). Disposable income means income "that is not reasonably necessary to be expended . . . for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the debtor." § 1191(d). Third, the debtor must be able to make all payments under plan. § 1191(c)(3)(A). Alternatively, there must be a reasonable likelihood that the debtor can make all plan payments, and the plan must provide appropriate remedies to protect creditors and interest holders if plan payments are not made. § 1191(c)(3)(B).

Bonfiglioli and the US Trustee argue the Fourth Modified Plan is not fair and equitable because it does not commit all the Debtor's projected disposable income to plan payments. ECF No. 111 at 6–7; ECF No. 112 at 4. Bonfiglioli asserts that the Debtor should be proposing to pay

$120,000.00 annually because prior plans proposed $60,000.00 in annual payments but did not include the TPG contract. ECF No. 112 at 4. The US Trustee contends the annual payments should be no less than $75,000.00 annually based on recent operating statements, the TPG contract, and accounting costs. ECF No. 111 at 6–7.

The Debtor argued there would not be more than $5,000.00 per month in disposable income because Frater hoped to resume taking a salary. Subsequently, some confusion arose over whether the projections already included Frater's salary and whether Frater had been receiving a salary during this case's pendency. The Court continued arguments on plan confirmation so the parties could confer and examine payroll and income records. Those discussions resulted in the Fourth Modified Plan and an additional fact stipulation. ECF Nos. 124, 128.

Ultimately, the plan and stipulation resolve these objections and demonstrate that the Fourth Modified Plan is fair and equitable. The parties have stipulated that Frater has not received a salary from the Debtor during this case's pendency. ECF No. 128 ¶ 5. The plan now provides that Frater may take a salary, up to $3,000.00 per month, to the extent that the Debtor's net cash flow exceeds the $5,000.00 monthly plan payments. ECF No. 124 at 4. Paying the CEO a very modest salary—contingent on the Debtor making its plan payments—does not make the plan unfair or inequitable. Paying the CEO more than nothing is an "expenditure[] necessary for the continuation, preservation, or operation of the business of the debtor," and $3,000.00 per month certainly is a reasonable amount. 11 U.S.C. § 1191(d). (The US Trustee's website cites a median income for single-earner families in Minnesota of $77,696.00—more than double Frater's maximum salary under the plan. See Census Bureau Median Family Income By Family Size, https://www.justice.gov/ust/eo/bapcpa/20260401/bci_data/median_income_table.htm.) Expecting Frater to work for no salary for three years is not reasonable, and the Bankruptcy

21

Code certainly does not require him to do so. In addition, there simply is no evidence for Bonfiglioli's suggestion that the Debtor has $120,000.00 in annual disposable income. Therefore, the Fourth Modified Plan is fair and equitable.

To summarize, the Debtor has met its burden of proof that the Fourth Modified Plan complies with the requirements of Sections 1191 and 1129. Bonfiglioli and the US Trustee have failed to rebut the Debtor's showing that the Fourth Modified Plan is proposed in good faith, feasible, fair and equitable, and otherwise confirmable.

**D. The Preconfirmation Modifications To The Plan Do Not Require Additional Evidence Or Renewed Acceptance.**

Lastly, although no party objects to the Fourth Modified Plan on these grounds, the Court notes that the Debtor's post-evidentiary hearing modifications to the plan do not require additional evidence or renewed acceptance. The modifications benefitted creditors, including Bonfiglioli, by increasing the frequency of distributions and clarifying the guaranty and judgment mechanism for Frater's guaranty. Based on the record from the January 26 evidentiary hearing (addressing the Second Modified Plan), the Fourth Modified Plan is also confirmable.

The modifications also do not trigger Rule 3019, which applies where a plan is modified after having been accepted and before confirmation. See Fed. R. Bankr. P. 3019(a). Here, confirmation is proceeding under Section 1191(b) and does not require acceptance by creditors. Therefore, no additional proceedings are required.

## CONCLUSIONS OF LAW

1. The Fourth Modified Plan has been proposed in good faith and not by any means forbidden by law.

22

2.  Confirmation of the Fourth Modified Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the plan.

3.  The Fourth Modified Plan does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

Therefore,

**IT IS ORDERED:**

1.  Bonfiglioli USA, Inc.'s Objection to Plan Confirmation at ECF No. 86 is OVERRULED.

2.  The US Trustee's Objection to Plan Confirmation at ECF No. 85 is OVERRULED

3.  An order confirming the Debtor's Fourth Modified Plan will be entered separately.


s/ William J. Fisher

Dated: *May 12, 2026*

_____

William J. Fisher
United States Bankruptcy Judge